NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

LUIS S., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, M.S., NAVAJO NATION, *Appellees*.

No. 1 CA-JV 21-0066
FILED 7-27-2021

Appeal from the Superior Court in Maricopa County
No. JD39969
The Honorable Sam J. Myers, Judge

**AFFIRMED**

COUNSEL

Thomas A. Vierling Attorney at Law, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee Department of Child Safety*

Law Office of Ed Johnson, PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellee M.S.*

---

## MEMORANDUM DECISION

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Jennifer M. Perkins joined.

---

**C R U Z**, Judge:

¶1 Luis S. ("Father") appeals from the superior court's order adjudicating his daughter M.S. a dependent child. Because M.S. is an enrolled member of the Navajo Nation ("the Nation"), this matter is subject to the Indian Child Welfare Act ("ICWA"), 25 United States Code ("U.S.C.") sections 1901 to 1963. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2 M.S. was born in January 2006. When M.S. was about two years old, Father was deported to Mexico. After Father was deported, M.S. saw him infrequently and had minimal phone contact with him.

¶3 In 2014 M.S.'s mother ("Mother") died. After Mother's death M.S. went to live with her maternal grandmother and then with her adult half-sister, who is also a member of the Navajo Nation. The sister tried to obtain guardianship of M.S., but Father objected. He sought to have M.S. placed with his parents in Tucson. Fifteen-year-old M.S. did not want to live with her grandparents in Tucson because she did not know them well and the grandparents exclusively speak Spanish—M.S. did not speak or understand Spanish. M.S. wanted to remain in the care of her sister. She did not want to live with Father in Mexico because she was unfamiliar with the culture and did not have a good relationship or bond with Father.

¶4 The superior court appointed a guardian ad litem ("GAL") for M.S. in the guardianship matter, and the GAL filed a private dependency petition. The petition alleged that Father had neglected M.S. by failing to meet her needs and not providing her with support for twelve years. The petition further alleged that Father had only a few in-person visits with M.S. since he was deported and that the contacts he had with her via a messaging application frequently ended with Father verbally abusing M.S. Finally, the petition alleged that M.S. was dependent due to domestic violence because Father engaged in domestic violence with Mother, leading to the breakup of the family.

¶5        The superior court ordered the Department of Child Safety ("DCS") to conduct an investigation, and it did so. DCS interviewed Father, who indicated he was not requesting reunification with M.S. but was instead seeking to have M.S. placed with his parents. Father did not request reunification services. Nevertheless, DCS set a case plan of reunification and provided Father with a referral for supervised visitation. Visitation occurred infrequently, however, because M.S. did not want to have contact with Father.

¶6        DCS found the sister's home to be appropriate, and it reported to the court that Father had not parented or provided support for M.S. since she was two years old. In addition, DCS learned that Father had recently verbally abused M.S., calling her "stupid" and "fragile," and telling her that she should get a DNA test because if she was not his daughter she could "fuck off."

¶7        Father contested the dependency petition, and the superior court held a dependency adjudication hearing. DCS, the Nation, and M.S. agreed that the superior court should grant the GAL's dependency petition and that M.S. should remain placed with her sister. M.S. told the court she would consent to a guardianship with the sister as her guardian. The court adjudicated M.S. dependent and changed the case plan to guardianship. It found that M.S. was dependent due to Father's failure to provide support for M.S. over an extended period of time, that continued custody of M.S. by Father was likely to result in serious emotional or physical danger to her, and that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and those efforts were unsuccessful. *See* 25 U.S.C. § 1912(d), (e). The court found that the domestic violence allegation had not been proven. Father timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-235(A), 12-2101(A)(1), and 12-120.21(A)(1).

**DISCUSSION**

¶8        Father argues insufficient evidence supported the dependency adjudication. He argues there was "no evidence" that he was an unfit parent, that living with him in Mexico was contrary to M.S.'s welfare, or that he neglected or abandoned her. Father also argues no reasonable evidence supported the superior court's ICWA findings.

¶9        A dependent child includes one "[i]n need of proper and effective parental care and control . . . who . . . has no parent or guardian

3

willing to exercise or capable of exercising such care and control," or one "whose home is unfit by reason of abuse, neglect, cruelty or depravity by a parent." A.R.S. § 8-201(15)(a)(i), (iii). Neglect includes "[t]he inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

¶10 The allegations in a dependency petition must be proven by a preponderance of the evidence. A.R.S. § 8-844(C). We review the superior court's order adjudicating a child dependent for an abuse of discretion. *Pima Cnty. Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987). We view the evidence in the light most favorable to sustaining the superior court's findings and generally will not reverse a dependency adjudication unless no reasonable evidence supports it. *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005). The superior court must determine whether a child is dependent based upon the circumstances existing at the time of the adjudication hearing. *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50, ¶ 12 (App. 2016). Because the primary consideration in a dependency proceeding is the best interests of the child, the superior court "is vested with a great deal of discretion." *Willie G.*, 211 Ariz. at 235, ¶ 21 (citation and internal quotation marks omitted).

¶11 Here, the dependency petition alleged that Father had neglected M.S. by failing to meet her needs since she was two years old. The superior court found that M.S. was dependent due to Father's failure to provide support for M.S. over an extended period of time, that custody of M.S. by Father was likely to result in serious emotional or physical danger to her, and that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and those efforts were unsuccessful. *See* 25 U.S.C. § 1912(d), (e).

¶12 Reasonable evidence supported the superior court's dependency and ICWA findings. Father testified that he had not physically parented M.S. since she was two years old. Father had not seen M.S. in person since 2019. At that time, Father gave M.S. $20 "because [he] couldn't offer her more." Father testified that he had not provided M.S. with money for housing or food, and that it was the responsibility of whoever was taking care of M.S. to meet her needs. Father agreed that living with him could impact M.S.'s emotional well-being, but nevertheless testified that fifteen-year-old M.S. was not old enough to decide where she lived. Father's testimony at the dependency adjudication hearing established that

he had neglected M.S. for most of her life and was continuing to neglect her.

**¶13** In addition, DCS case manager Michael Carrillo testified that Father had not supported M.S. financially or emotionally since Mother died. He testified that returning M.S. to Father would cause her emotional trauma due to her lack of a bond with Father. The Nation's qualified ICWA expert, Cassandra Gorman, testified that based on the particular facts of this case, DCS made active efforts to provide remedial efforts and rehabilitative programs designed to prevent the breakup of the Indian family. Further, Gorman testified that any effort to reunify M.S. and Father would be unsuccessful and likely result in serious emotional or physical damage to M.S. Gorman's "worst fear" was that M.S. would run away if placed with Father.

**¶14** Father argues that DCS provided "no services" to prevent the breakup of the Indian family. DCS contends he waived this argument by failing to raise the issue before the dependency adjudication hearing. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178-79, ¶¶ 16-18 (App. 2014) (any claim that DCS is failing to provide appropriate reunification services must be timely raised in the superior court or the issue is waived). When DCS became involved in the case Father indicated he did not seek to reunify with M.S. and did not need reunification services. And thereafter, he did not raise any issue in the superior court concerning reunification services. Even if Father did not waive his argument about active efforts, the superior court did not err by basing its active efforts finding on the Nation's ICWA expert's testimony that DCS made active efforts based on the particular circumstances of this case.

## CONCLUSION

**¶15** For the foregoing reasons, we affirm the superior court's order adjudicating M.S. dependent.

